UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

KARIM KOUBRITI,

      Plaintiff,

vs.

DEPUTY ROJO, et al.,

      Defendants.
_____/

Civil Action No.
05-CV-74343-DT

HON. BERNARD A. FRIEDMAN

**OPINION AND ORDER GRANTING DEFENDANTS' SECOND MOTION FOR
SUMMARY JUDGMENT (DKT. NO. 29) AS TO COUNT III;
DENYING SUMMARY JUDGMENT AS TO COUNTS I AND IV;
and
DENYING PLAINTIFF'S MOTION TO STRIKE DEFENDANTS' SECOND MOTION
FOR SUMMARY JUDGMENT (DKT. NO. 31)**

This matter is presently before the Court on Defendants' Second Motion for Summary

Judgment, pursuant to Federal Rule of Civil Procedure 56(c). Karim Koubriti ("Plaintiff")

alleges that Defendant Rojo mistreated him—during his confinement at the Wayne County

Jail—because he is a Muslim. Plaintiff had originally claimed that several Wayne County

deputies subjected him to unnecessary strip searches, served him pork, and placed him in a cell

without any time for exercise or recreation. Defendants deny that any mistreatment occurred. In

January 2007, the Court granted summary judgment against Plaintiff as to his pork claim (Count

II) and denied summary judgment as to his other claims (Counts I, III, and IV). The Court also

dismissed the five unknown deputies, which left only Deputy Rojo and Wayne County as

Defendants.

The Court has had the opportunity to review all relevant materials in this case. Pursuant

to Eastern District of Michigan Local Rule 7.1(e)(2), the Court shall decide this motion without

oral argument.  The Court will grant summary judgment in favor of Defendants as to Count III

and deny summary judgment as to Counts I and IV.  In addition, the Court will deny Plaintiff's

Motion to Strike Defendants' Second Motion for Summary Judgment.

## I.    HISTORY OF THE CASE

### A.    FACTUAL BACKGROUND

On September 17, 2001, six days after the terrorist attacks against the United States on

September 11, 2001, Plaintiff was arrested for document fraud.[1]  (Defs.' Br. Supp. Mot., 1; Pl.'s

Br. Supp. Resp., 1.)[2]  On that day, he was taken into custody at the Wayne County Jail.[3]  (Defs.'

Br. Supp. Mot., 3 and Ex. A at 11-12; Pl.'s Br. Supp. Resp., 2.)  According to Defendants,

Plaintiff was initially classified as a Level 4 prisoner.  (Defs.' Supplemental Br., 5.)  In early

October 2001, Plaintiff was given a protective custody classification.  (Id.)  In late August 2002,

Plaintiff was given a maximum security classification, pursuant to a request from the United

States Marshals Service.  (Id. Ex. 1A at 2.)

On June 3, 2003, Plaintiff was convicted in the criminal case before Judge Gerald Rosen.

------

[1]The indictment was later amended to include terrorism-related activities.  Ultimately, the court dismissed the terrorism charge and ordered a new trial on the fraudulent document charges because of an apparent non-disclosure of exculpatory evidence.  United States v. Koubriti, 01-CR-80778-DT.

[2]Some of the citations in this Opinion and Order use the term "Mot."  This notation represents the motion at hand, which is Defendants' *Second* Motion for Summary Judgment.

[3]Defendants are somewhat inconsistent.  In their Second Motion for Summary Judgment, they state that Plaintiff was incarcerated on September 17, 2001.  (Defs.' Br. Supp. Mot., 2-3.)  However, in their Supplemental Brief, Defendants state that Plaintiff was incarcerated on September 18, 2001.  (Defs.' Supplemental Br., 2 n.2.)

In August 2003, he was transferred to the Clair County Jail.[4]  (Id. Ex. 3B at 3; Pl.'s Br. Supp. Resp., 5.)

Plaintiff returned to the Wayne County Jail in late 2003.[5]  (Defs.' Supplemental Br., 2 n.2; Pl.'s Supplemental Br., 2.)  On December 9, 2003, Judge Rosen issued an order that directed the Wayne County Jail to keep Plaintiff "separate and apart" from his co-defendants.  (Defs.' Supplemental Br., Ex. 1C.)  Plaintiff was incarcerated at the Wayne County Jail until mid-2004.[6] (Id. at 2 n.2; Pl.'s Supplemental Br., 2.)

## B.    PROCEDURAL HISTORY

Plaintiff filed his Complaint in November 2005, pursuant to 42 U.S.C. § 1983.  Plaintiff's Complaint included the following counts: (1) unnecessary strip searches in violation of the First and Fourth Amendments; (2) service of pork products in violation of the First Amendment; (3) no exercise or recreation in violation of the Eighth Amendment; and (4) improper policies,

---

[4]Plaintiff states that he was incarcerated at the Wayne County Jail until late August 2003. (Pl.'s Supplemental Br., 2.)  On the other hand, Defendants state that Plaintiff was transferred from the Wayne Count Jail to the Clair County Jail on August 1, 2003.  (Defs.' Supplemental Br., 2 and Ex. 3B.)

[5]Plaintiff and Defendants disagree as to the month in which Plaintiff returned to the Wayne County Jail.  According to Plaintiff, he returned to the Wayne County Jail in November 2003.  (Pl.'s Supplemental Br., 2.)  On the other hand, Defendants assert that Plaintiff returned to the Wayne County Jail in December 2003.  (Defs.' Supplemental Br., 2 & 2 n.2.)  However, it should be noted that in their Second Motion for Summary Judgment, Defendants state that Plaintiff's return to the Wayne County Jail was in November 2003.  (Defs.' Br. Supp. Mot., 4.)

[6]As before, Plaintiff and Defendants disagree about Plaintiff's release date from the Wayne County Jail.  According to Plaintiff, he was released in July 2004.  (Pl.'s Supplemental Br., 2.)  On the other hand, Defendants state that Plaintiff's incarceration ended on June 28, 2004.  (Defs.' Supplemental Br., 2 n.2.)  As before, it should be noted that in their Second Motion for Summary Judgment, Defendants state that Plaintiff's incarceration ended in July 2004.  (Defs.' Br. Supp. Mot., 4.)

practices, and customs by Wayne County. Defendants filed an Answer.

On July 25, 2006, Defendants filed their first Motion for Summary Judgment. Plaintiff filed a Response, and Defendants filed a Reply. On January 3, 2007, the Court granted summary judgment as to Count II (pork products) but denied summary judgment as to the remaining counts. The Court also dismissed the five unknown deputies.

On March 15, 2007, Defendants filed a Second Motion for Summary Judgment. After obtaining three extensions of time, Plaintiff filed a Response on May 31, 2007. Defendants filed a Reply on June 7, 2007. Furthermore, in late June 2007, the Court ordered that the parties file supplemental briefs, in order to clarify certain issues. Plaintiff and Defendants both filed their supplemental briefs on July 16, 2007.

In addition, on March 22, 2007, Plaintiff filed a Motion to Strike Defendants' Second Motion for Summary Judgment. On April 5, 2007, Defendants filed a Response.

## II.   <u>STANDARD OF REVIEW</u>

Federal Rule of Civil Procedure 56(c) provides that summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." FED. R. CIV. P. 56(c). The United States Supreme Court has explained that Rule 56(c) "authorizes summary judgment 'only where the moving party is entitled to judgment as a matter of law, where it is quite clear what the truth is, . . . (and where) no genuine issue remains for trial . . . (for) the purpose of the rule is not to cut litigants off from their right of trial by jury if they really have issues to try.'" <u>Poller v. Columbia Broad. Sys., Inc.</u>, 368 U.S. 464, 467 (1962) (quoting <u>Sartor v. Arkansas Natural Gas Corp.</u>, 321

U.S. 620, 627 (1944)). In other words, if there is a genuine dispute as to a material fact, then summary judgment should not be granted.

The party seeking summary judgment carries the initial burden of "demonstrat[ing] the absence of a genuine issue of material fact." Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). When a court determines whether a genuine issue of material fact exists, the court must view the evidence "in the light most favorable to the opposing party." Adickes v. S.H. Kress & Co., 398 U.S. 144, 157 (1970). See Bender v. Southland Corp., 749 F.2d 1205, 1210-11 (6th Cir. 1984) (stating "[t]he evidence and all reasonable inferences which may be drawn therefrom must be viewed in the light most favorable to the party opposing the summary judgment motion"). The Court's role is not "to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249 (1986). See 60 Ivy St. Corp. v. R.C. Alexander, 822 F.2d 1432, 1435-36 (6th Cir. 1987) (stating "[t]he judge's function at the point of summary judgment is limited to determining whether sufficient evidence has been presented to make the issue a proper jury question, and not to judge the evidence and make findings of fact"). A factual dispute is "genuine" when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson, 477 U.S. at 248. Thus, if a court finds that the evidence, when taken in a light most favorable to the non-moving party, presents a genuine question of material fact, then the court should deny the moving party's motion for summary judgment.

## III.    DEFENDANTS' SECOND MOTION FOR SUMMARY JUDGMENT

### A.    COUNT I—VIOLATIONS OF FIRST AND FOURTH AMENDMENTS (STRIP SEARCHES)

In the first count of his Complaint, Plaintiff alleges that he was repeatedly subjected to

unwarranted and unreasonable strip searches that were conducted to humiliate him because he is a Muslim. (Pl.'s Compl. ¶ 18.) Plaintiff states that he was strip searched when he returned to the jail from federal court, and then he was "escorted straight to his cell and forced to strip full naked again." (Id. ¶ 17.) Plaintiff asserts that the strip searches were conducted by as many as six deputies at one time. (Pl.'s Br. Supp. Resp., 9.) Plaintiff argues that "strip searching an inmate repeatedly and within minutes, while said inmate is handcuffed and under close and uninterrupted supervision, serves no constitutional purpose." (Id. at 10.) He argues that the strip searches violated his First Amendment rights because he was targeted for being a Muslim. He argues that the strip searches violated the Fourth Amendment because they were unreasonable.

On the other hand, Defendants assert that there was no violation of Plaintiff's constitutional rights. Defendants state that Plaintiff was not treated any differently than other prisoners, as all prisoners were "searched upon reentry into the secure perimeter of the jail, and then again upon entry to their housing unit." (Defs.' Br. Supp. Mot., 4.) Defendants claim that the strip searches were "completely consistent with the application of the Wayne County Jail Search policies." (Id. at 8.) Moreover, Defendants state that the strip searches were necessary to prevent traffic in contraband and to ensure the safety of prisoners and staff. (Id. at 6.) Further, Defendants state that the strip searches were necessary because Plaintiff was classified as an escape risk, had violent tendencies, and a history of misbehavior at the jail.[7] (Id.)

---

[7]One of Defendants' justifications for Plaintiff's strip searches seems to be based on the Alert Notice from the United States Marshals Service, which declared that Plaintiff was an "escape risk" and had "violent tendencies." (Defs.' Supplemental Br., Ex. 1B.) However, the Marshals Service did not issue this notice until December 2003, which means that it would not apply to Plaintiff's incarceration during the time period of June 2003 to August 2003. The Court, though, does recognize that Plaintiff had been cited by the jail's staff for disruptive and disrespectful behavior prior to June 2003.

In Bell v. Wolfish, the United States Supreme Court held that the "Fourth Amendment prohibits only unreasonable searches" of "both convicted prisoners and pretrial detainees." 441 U.S. 520, 558 (1979). In order to determine whether a search is reasonable, the Supreme Court stated that a balancing test should be used, in order to weigh a correctional facility's need for security and penological interests, with a pretrial detainee's or a prisoner's right, albeit diminished, to privacy. The Supreme Court explained the balancing test as follows:

> The test of reasonableness under the Fourth Amendment is not capable of precise definition or mechanical application. In each case it requires a balancing of the need for the particular search against the invasion of personal rights that the search entails. Courts must consider the scope of the particular intrusion, the manner in which it is conducted, the justification for initiating it, and the place in which it is conducted.

Bell, 441 U.S. at 559. The Supreme Court further explained that the balancing test should not impinge on the federal courts' deference to prison administrators and their "wide range of 'judgment calls' that meet constitutional and statutory requirements." Id. at 562. The Supreme Court has warned that a "detention facility is a unique place fraught with serious security dangers." Id. at 559. And the Sixth Circuit has echoed such concerns, by stating that it is reasonable for officers to conduct "particularized searches where objective circumstances indicate such searches are needed to maintain institutional security." Masters v. Crouch, 872 F.2d 1248, 1253-54 (6th Cir. 1989). However, a court's deference to prison administrators should not prevent or impede a thorough and fair review of a plaintiff's allegations of constitutional violations.

Here, the Court finds that the full strip searches of Plaintiff when he re-entered the jail were reasonable. Plaintiff was designated as a maximum-security inmate. Plaintiff was a

defendant in an incredibly high-profile, terrorism-related case. Plaintiff was consistently traveling between the jail and federal court for trial matters. Thus, it seems reasonable that the deputies and officers would conduct full strip searches for contraband after each time that Plaintiff had contact with people from outside the jail.

However, the Court finds that the strip searches of Plaintiff when he returned to his cell may have been unreasonable. Defendants do not seem to sufficiently articulate the interest that is served by the repeated strip searches of Plaintiff, especially when the allegations are taken in the light most favorable to Plaintiff. Plaintiff alleges that he was ordered to strip completely naked, sometimes in front of six deputies. Plaintiff further alleges that these strip searches took place both when he returned to the Wayne County Jail and then again when he returned to his cell minutes later, even though he was handcuffed and surrounded by law enforcement officers at all times.

Defendants explain that the "Wayne County Jail had clear policies outlining that inmates were to be searched upon reentry into the secure perimeter of the jail, and then again upon entry to their housing unit." (Defs.' Br. Supp. Mot., 4.) Defendants direct the Court to Sections 14.4 and 14.5 of the Wayne County Jail Operations Manual. However, the Court finds that Section 14.5 does not apply to this situation,[8] and that Defendants did not comply with Section 14.4.

_____

[8]Section 14.5 is entitled "Security Inspections (Searches)." (Defs.' Mot., Ex. I3 at 1.) The section refers to "unannounced and irregularly timed security inspections" of physical locations, such as the housing units, recreation areas, and work areas. The purpose of the security sweeps are to "detect weapons[,] dangerous and nuisance contraband, to recover missing, hoarded, or stolen property and to prevent escape." (Id.) When a security inspection is conducted, the manual allows for strip searches of prisoners in those physical locations. The security inspections are to be conducted by an "Inspection Team" that has been "assemble[d] . . . in the Sergeant's office" and has been informed "which area is to be inspected and what specific items, if any, are being sought." (Id.)

Section 14.4 is entitled "Security, Inmate Searches."  (Id. Ex. I2 at 1.)  Section 14.4

states:

> POLICY:
> To prevent the introduction of weapons and contraband into the
> facility and to control the possession of weapons and contraband by
> inmates during the duration of their confinement, Jail Staff will
> conduct *appropriate searches* of inmates at the time of admission to
> the facility, any time an inmate *re-enters the secure perimeter of the
> facility*, any time an inmate *leaves or returns to a housing unit* and
> at other *unannounced and irregular times*, as deemed necessary to
> inhibit inmate traffic in contraband.

(Id. (emphasis added).)  Section 14.4 defines "appropriate searches" and when such searches

should be conducted:

> A *"strip" search* will be conducted any time an inmate *re-enters
> the secure perimeter of the facility*, upon a contact visit, during
> security inspections and/or reasonable cause to believe an inmate
> is involved in trafficking of contraband.
> . . . .
> A *"frisk" or "pat" search* is to be conducted any time an inmate
> *leaves or returns to a housing unit* and at other unannounced or
> irregular times to inhibit inmate traffic in contraband.

(Id. at 2,4 (emphasis added).)

Section 14.4 further defines the procedures for conducting a "strip" search and a "frisk"

------

The Court finds that Section 14.5 does not apply to Plaintiff's situation.  First, Plaintiff's
allegations do not concern "unannounced and irregularly timed" inspections.  Plaintiff is alleging
that he was strip searched *every time* that he returned to his cell, even though he had just been
strip searched minutes earlier when he re-entered the jail.  As such, the strip searches were
routine and regular.  Second, the strip searches at issue are not the same type of strip searches
that were conducted during the security inspections.  Plaintiff alleges that *he* was the target of the
repeated strip searches.  On the contrary, the security inspections of Section 14.5 target a
*physical location*, and any prisoners who may be in that specific area.  Thus, the regulations
applicable to the security sweeps addressed in Section 14.5 do not apply to the case at hand.

search.[9]  In addition, Section 14.4 identifies the circumstances under which a "strip" search is

authorized:

> Strip searches can only be conducted . . . under the following conditions:
> a.    There is an articulable suspicion that the inmate is carrying contraband or other prohibited materials.
> b.    At the time of intake, if the inmate is charged with a felony or a violent crime and may be concealing a weapon.
> c.    At the time of intake, if the inmate has been arrested for possession of drugs.
> d.    At the time of intake, if drugs or weapons are found during the frisk search.
> e.    At any time that contraband is detected on an inmate during a frisk search.
> f.    When authorized to do so in writing because an inmate has been classified to administrative segregation or maximum security as an escape risk and/or for aggressive assaultive behavior.
> g.    When good cause to believe that a strip search is necessary.

(Id. at 5-6.)  Lastly, Section 14.4 requires that all strip searches are "documented in the

workstation log indicating the inmate's name and number, the officer doing the search, the

reason for the search and the location of the search."  (Id. at 6.)

    The Court finds that Defendants cannot explain away their repeated strip searches of

---

[9]A "strip" search is an unclothed body search.  A strip search requires the prisoner to remove all of his clothing.  The officer thoroughly examines the tongue and mouth area; inspects the chest area; checks the groin; inspects the legs; checks the neck and back area; and checks the feet and toes.  In addition, the prisoner is required to spread his legs and to lift his penis and scrotum.  He is also required to bend over and spread the cheeks of his buttocks.  (Defs.' Mot., Ex. I2 at 4-5.)

    A "frisk" search is a clothed body search.  A frisk search does not require the prisoner to remove all of his clothing.  The officer examines the tongue and mouth area; checks the nostrils; checks the ears; and checks the hair.  In addition, the prisoner is required to spread his legs and hold out his arms.  The officer checks the prisoner's collar, shoulders and arms, hands, armpits, chest and waist, back, groin area, buttocks, legs, feet, and toes.  (Defs.' Mot., Ex. I2 at 2-4.)

Plaintiff by falling back on the language of the Wayne County Jail Operations Manual.  The language of the manual does not allow for the second strip search of Plaintiff.  The manual expressly identifies the circumstances under which strip searches *must* be conducted.  The manual states that a "strip search *will* be conducted any time an inmate re-enters the secure perimeter of the facility," among other times.[10]  (Id. at 4 (emphasis added).)  However, the section does not state that a *strip* search will be conducted when a prisoner returns to his cell.  The Wayne County Jail Operations Manual expressly authorizes a "frisk" search—not a "strip" search—every time that a prisoner returns to his cell.  (Id. Ex. I2 at 2.)  It should be noted that the section does call for a strip search to be conducted any time there is "reasonable cause to believe an inmate is involved in trafficking of contraband."  (Id.)  As explained above, the Court finds that there was no reasonable cause to believe that Plaintiff was involved in trafficking contraband within the jail.  He was constantly surrounded by officers and deputies.  He was stripped naked and searched.  All the while, he was under intense surveillance, and as

---

[10]For instance, the manual states several circumstances "at the time of intake" where a strip search is required.  (Defs.' Mot., Ex. I2 at 5-6.)  However, those circumstances do not apply to the second strip search of Plaintiff, for the second search occurred *after* the "time of intake" and instead when Plaintiff returned to his cell.  The manual further lists that strip searches can be conducted if there is "an articulable suspicion that the inmate is carrying contraband or other prohibited materials," or if there is "good cause to believe that a strip search is necessary."  (Id.)  The Court finds that there is no "articulable suspicion" or "good cause" for a second strip search of Plaintiff, under these specific circumstances.  Lastly, the manual states that strip searches can be conducted when "authorized to do so in writing because an inmate has been classified . . . maximum security as an escape risk and/or for aggressive assaultive behavior."  (Id. at 6.)  Although Plaintiff was classified as a maximum-security prisoner and later as an escape risk, Defendants have not provided the Court with any *written authorization* indicating that the officers should strip search Plaintiff every time that he returns to his cell.  Moreover, even if there were written authorization, Plaintiff would still be able to generate a genuine issue of factual dispute as to the reasonableness of the second strip search.

Defendants have explained, "policy dictated that he required additional supervision by supervisory officers during transport." (Id. at 7.) Thus, the Court finds that Defendants should have strip searched Plaintiff—according to the jail's manual—when Plaintiff re-entered the secure perimeter of the facility, but not when Plaintiff returned to his jail cell.

The Court understands the purpose for a strip search when a prisoner returns to the jail, as the prisoner has had contact with outsiders; but, the Court does not understand the interest in forcing the inmate to again fully undress within minutes after the first search—especially when the inmate was handcuffed and surrounded by law enforcement officers for the entire time. Defendants contend that there is a high possibility for the introduction of contraband in the registry area of the jail because there were hundreds of prisoners in that area. (Defs.' Br. Supp. Mot., 6.) If there were such a high possibility of contraband exchange in the registry area, the manual should have plainly required a second "strip" search every time that a prisoner leaves the registry area and returns to his jail cell. Furthermore, the Court wonders why Plaintiff—of all people—would have been allowed to mix with hundreds of prisoners, given the fact that Plaintiff was a maximum-security prisoner in a high-profile, terrorism-related case.

In sum, the Court finds that—under these circumstances—a second *strip* search may have been unreasonable. That is not to imply that a *frisk* search conducted when Plaintiff returned to his cell would have been inappropriate. However, when viewing the evidence in the light most favorable to Plaintiff, the deputies repeatedly conducted full-nude strip searches of Plaintiff, even though Plaintiff had been continuously supervised and surrounded by law enforcement officers. It seems questionable that Plaintiff—re-clothed and cuffed after having been stripped fully naked, thoroughly searched, and constantly under watch—would somehow be able to pick

up a piece of contraband (while surrounded by officers and deputies) and maneuver it into his underwear as he made his way back to his cell.[11]  While the Wayne County Jail Operations Manual allows for a *frisk* search at Plaintiff's cell, a second *strip* search—under these circumstances—does not seem permissible.  At the very least, Plaintiff has generated a genuine dispute as to whether the second strip search was reasonable under the circumstances.  Thus, the Court finds that there is—especially when taken in the light most favorable to Plaintiff—a genuine issue of material fact about the reasonableness of the second strip search at Plaintiff's cell.[12]  As such, summary judgment will be denied as to Count I.

**B.      COUNT III—VIOLATION OF EIGHTH AMENDMENT (MAXIMUM-SECURITY CONFINEMENT)**

In his Complaint, Plaintiff alleges that he was confined to a "maximum security cell[ ] for 23 hours a day without opportunity for exercise or physical activity."  (Pl.'s Compl. ¶ 30.)  Plaintiff asserts that such confinement was "cruel and unusual punishment" and therefore violated his Eighth Amendment rights.  (Id. ¶ 29.)  In his Supplemental Brief, Plaintiff clarifies that he "is claiming that he was denied *any* exercise/recreation for the time period he was incarcerated at the Wayne County Jail following his conviction on June 3, 2003."  (Pl.'s Supplemental Br., 2 (emphasis added).)  In particular, Plaintiff claims that he was denied any exercise or recreation from June 2003 until August 2003, and from November 2003 until July

---

[11]The Court opines whether a reasonable alternative would have been a second strip search at Plaintiff's cell, where Plaintiff was allowed to retain his underwear or boxer shorts.

[12]It should be noted, again, that the Court is not suggesting that a second search was unreasonable.  The Court only finds that, when taken in the light most favorable to Plaintiff, a fully naked second *strip* search—under these specific circumstances—may have been unreasonable.

2004.[13]  (Id.)  During these time periods, Plaintiff states that he "was never taken to the

gymnasium or the recreation area in the Wayne County Jail" and that he "was never taken

outside for any recreational purposes or for the purpose of getting fresh air."  (Id.)

The Eighth Amendment prohibits "cruel and unusual punishments."  U.S. Const. amend.

VIII.  The United States Supreme Court has ruled that "[i]t is undisputed that the treatment a

prisoner receives in prison and the conditions under which he is confined are subject to scrutiny

under the Eighth Amendment."  Helling v. McKinney, 509 U.S. 25, 31 (1993).  The Sixth Circuit

has explained that "[a]n Eighth Amendment claim comprises an objective and a subjective

component."  Rodgers v. Jabe, 43 F.3d 1082, 1086 (6th Cir. 1995).  When a plaintiff alleges that

the conditions of his confinement constitute a constitutional violation, the plaintiff must satisfy

both prongs of analysis under the Eighth Amendment.  The Sixth Circuit has stated:

> First, the deprivation alleged must be, objectively, sufficiently
> serious; a prison official's act or omission must result in the denial
> of the minimal civilized measure of life's necessities.  Second, the
> prison official's state of mind [must be] one of "deliberate
> indifference"[14] to inmate health or safety.

---

[13]Plaintiff limits his Eighth Amendment claim to the time period after his conviction on June 3, 2003.  The Eighth Amendment is not applicable to pretrial detainees, as it provides constitutional protection against "cruel and unusual punishments" after "a formal adjudication of guilt."  Spencer, 449 F.3d at 727 (quotations omitted).  The "claims of pretrial detainees" should "rel[y] on the Due Process Clause rather than the Eighth Amendment."  Bell, 441 U.S. at 537 n.16.  Thus, in assessing whether there exists a factual dispute as to a possible Eighth Amendment violation in this case, the Court will consider the conduct during Plaintiff's post-conviction confinement.

[14]The Sixth Circuit has explained that "[t]he deliberate-indifference requirement is satisfied 'only if [the official] knows that inmates face a substantial risk of serious harm and disregards that risk by failing to take reasonable measures to abate it.'  The Supreme Court has explicitly acknowledged that 'a factfinder may conclude that a prison official knew of a substantial risk from the very fact that the risk was obvious.'"  Spencer, 449 F.3d at 729 (quoting Farmer v. Brennan, 511 U.S. 825, 842, 847 (1994)).

14

Spencer v. Bouchard, 449 F.3d 721, 728 (6th Cir. 2006) (quotations and citations omitted). Thus, summary judgment should only be granted if the evidence, when viewed in the light most favorable to Plaintiff, shows that prison officials committed a severe deprivation while possessing a culpable state of mind. Rodgers, 43 F.3d at 1086.

The constitutional inquiry under the Eighth Amendment is fact-based. A court must conduct a case-by-case analysis in order to consider an individual prisoner's situation. Some facts to be considered are: "the size of the cell, opportunity for contact with other inmates, time per day expended outside the cell, justifications for denial of the right to exercise, physical or psychological injuries resulting from a lack of exercise or a particularized need for exercise." Patterson v. Mintzes, 717 F.2d 284, 289 (6th Cir. 1983).

The Sixth Circuit has found that "[i]t is generally recognized that a total or near-total deprivation of exercise or recreational opportunity, without penological justification, violates Eighth Amendment guarantees. Inmates require regular exercise to maintain reasonably good physical and psychological health." Id. That said, the Sixth Circuit has held that every prisoner is not entitled to the same amount of exercise per day, nor is there an across-the-board constitutional minimum of daily exercise for prisoners. Rodgers, 43 F.3d at 1086-88. In fact, the Sixth Circuit has explained that it has "addressed restrictions on a prisoner's leeway to exercise[,]" but that it has *not* "set a minimum amount of exercise required in order to avoid violating the Eighth Amendment[.]" Id. at 1086. Moreover, the Sixth Circuit has stated that it has "stopped far short of endorsing [a specific] amount, or indeed *any* amount, as a constitutional requirement." Id. at 1087.

   **1.      *June 2003 to August 2003***

Plaintiff alleges that he was denied any exercise or recreation from June 2003 to August 2003. Plaintiff states that he was "never taken to the gymnasium or the recreation area in the Wayne County Jail" and that he was "never taken outside for any recreational purposes." (Pl.'s Supplemental Br., 2.) As such, Plaintiff asserts a complete deprivation of any exercise or recreation. On the other hand, Defendants state that Plaintiff was provided adequate exercise and recreation.

Here, the Court finds that Plaintiff's confinement did not amount to "cruel and unusual" punishment under the Eighth Amendment. As explained above, an Eighth Amendment violation requires a plaintiff to meet both an objective prong and a subjective prong. In this case, Plaintiff fails to satisfy either prong.

First, Plaintiff fails to satisfy the objective prong, as he has not shown that he was deprived of a "minimal civilized measure of life's necessities." Rhodes v. Chapman, 452 U.S. 337, 347 (1981). Plaintiff admits that during the time period from June 2003 until August 2003, he was housed in a cell that was 5 feet 8 inches by 7 feet 6 inches. (Pl.'s Supplemental Br., 2.) The cell, along with two other identical cells, was attached to a common area that was approximately 18 feet 6 inches by 9 feet.[15] (Id.; Defs.' Mot., Ex. J.) Thus, the common area was approximately 167 square feet. The common area contained a bench and a television. (Pl.'s Supplemental Br., 2; Defs.' Mot., Ex. J.) Plaintiff states that he was held in his cell for 23 hours per day, but he was allowed in the common area for one hour each day. (Pl.'s Supplemental Br., 2.)

---

[15]The common area is often referred to as the "ward" or the "rock." (Pl.'s Supplemental Br., 2; Defs.' Mot., Ex. J.)

The Court does not find such confinement to be a total or near-total deprivation of exercise and recreation. The time period in question—June 2003 to August 2003—is about three months. During that time, Plaintiff had access to a common area that was approximately 167 square feet, which is sufficiently spacious for indoor exercise. Furthermore, Plaintiff admits that he had access to the common area every day. Such a daily opportunity for exercise or recreation exceeded the other Level One Maximum Security prisoners, who were only allowed "one hour per day, three days per week" of exercise/recreation. (Defs.' Mot, Ex. C. at 1.) Moreover, Defendants explain that the common area contained a "television, checkers, chess, and reading material[,] as well as weekly movies broadcast to the televisions." (Defs.' Br. Supp. Mot., 5; Defs.' Supplemental Br., Ex. 3A.) Further, when describing "these conditions and how it affected him," Plaintiff states that he felt "bad" and that his "face was full with bumps." (Pl.'s Br. Supp. Resp., 13.) Such allegations do not amount to a showing of significant physical or mental injuries. Plus, Plaintiff did not state a particularized need for exercise. Moreover, it appears that Plaintiff had visual and audio contact with prisoners on neighboring wards. (Defs.' Supplemental Br., 6.) Under these circumstances, the Court finds that Plaintiff has not satisfied the objective prong of the Eighth Amendment.

However, even if Plaintiff were to have met the objective prong of an Eighth Amendment claim, Plaintiff would still fail to satisfy the subjective prong. The subjective prong requires a plaintiff to show that a defendant exhibited a "deliberate indifference" to the plaintiff's health or safety. Plaintiff has not submitted any evidence showing that Defendants possessed such a state of mind. Moreover, Plaintiff was classified as a maximum-security prisoner in protective custody, and he was confined accordingly. As with the objective prong, Plaintiff fails to satisfy the subjective prong of the Eighth Amendment. Thus, Plaintiff has not created a genuine issue

of material fact as to his alleged violations of the Eighth Amendment, and the Court will grant summary judgment against Plaintiff as to Count III.

## 2. *November/December 2003 to June/July 2004*

Plaintiff alleges that he was denied any exercise or recreation from late 2003 until mid-2004. As above, the Court finds that Defendants did not violate Plaintiff's constitutional rights under the Eighth Amendment. First, Plaintiff was housed in the same type of multi-room ward as he had been from June 2003 to August 2003. (Pl.'s Supplemental Br., 2.) As before, Plaintiff admits that he "had access to the ward [common area]." (Id.) However, this time, Plaintiff does not indicate that his access to the common area was limited to only one hour per day. (Id.) In fact, Defendants explain that Plaintiff had access to the common area—and to the other two cells—for 16 hours per day. (Defs.' Supplemental Br., 6-7; Pl.'s Br. Supp. Resp., 6.) In other words, Plaintiff had access, for 16 hours each day, to a total area of almost 300 square feet. (Defs.' Mot., Ex. J; Pl.'s Br. Supp. Resp., 6.) Therefore, the Court finds that Plaintiff was provided an adequate opportunity and sufficient space for exercise and recreation.

Moreover, on December 11, 2003, the United States Marshals Service sent an Alert Notice to the Wayne County Jail that Plaintiff was an "escape risk"; had "violent tendencies"; and was involved in "terrorist related" charges. (Defs.' Supplemental Br., Ex. 1B.) The Alert Notice instructed the Wayne County Jail to separate Plaintiff from his co-defendants. (Id.) Furthermore, Judge Rosen issued an order that Plaintiff and his co-defendants were to be "kept separate and apart" and "that they have no contact with each other while they are in the custody of the Wayne County Jail." (Id. Ex. 1C.) The Notice Alert and Judge Rosen's order further show why Plaintiff was kept separated from the others. As explained above, Plaintiff has failed to create a genuine issue of material fact regarding his Eight Amendment claim. Therefore, the

Court will grant summary judgment against Plaintiff as to Count III.

### C.    <u>COUNT IV—WAYNE COUNTY</u>

The last count of Plaintiff's Complaint is directed at Defendant Wayne County. Plaintiff asserts that the mistreatment was the result of Defendant Wayne County's policies, procedures, and customs. (Pl.'s Br. Supp. Resp., 14.)

Title 42 U.S.C. § 1983 states:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress . . . .

42 U.S.C. § 1983 (2003). A sufficient claim for a violation of Section 1983 must show that: "(1) a person, (2) acting under the color of state law, (3) deprived him of a federal right." <u>Sutherland v. Mich. Dep't of Treasury</u>, 344 F.3d 603, 614 (6th Cir. 2003). The United States Supreme Court has held that municipalities and local governments are considered "persons" under Section 1983, so they can therefore be liable for constitutional deprivations. <u>Monell v. Dep't of Soc. Servs. of N.Y.</u>, 436 U.S. 658, 690 (1978).

Municipal liability for constitutional deprivations can arise "when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury that the government as an entity is responsible under § 1983." <u>Id.</u> at 694. A municipal government, though, cannot be held liable solely on the basis of a respondeat superior theory. <u>Id.</u> at 691. <u>See also</u> <u>Bd. of County Comm'rs v. Brown</u>, 520 U.S. 397, 403 (1997) ("We have consistently refused to hold municipalities liable

under a theory of *respondeat superior*.")  In other words, a city government is not liable for "every misdeed of [its] employees and agents."  <u>Garner v. Memphis Police Dep't</u>, 8 F.3d 358, 363 (6th Cir. 1993).  A city government is only liable when the custom or policy is the "moving force" behind the deprivation of a plaintiff's constitutional rights.  <u>Monell</u>, 436 U.S. at 694.  In order to show such "moving force" liability under Section 1983, the Sixth Circuit has ruled that a plaintiff must "(1) identify the municipal policy or custom, (2) connect the policy [or custom] to the municipality, and (3) show that his particular injury was incurred due to execution of that policy [or custom]."  <u>Turner v. City of Taylor</u>, 412 F.3d 629, 639 (6th Cir. 2005) (quoting <u>Alkire v. Irving</u>, 330 F.3d 802, 815 (6th Cir. 2003)).

A "policy" is often a formal or expressly stated rule or regulation, whereas an informal policy—a "custom"—"is a legal institution that is permanent and established, but is *not authorized by written law*."  <u>Feliciano v. City of Cleveland</u>, 988 F.2d 649, 655 (6th Cir. 1993) (emphasis added).  In order to create municipal liability based on a custom, the "custom must be 'so permanent and well settled as to constitute a 'custom or usage' with the force of law.'"  <u>Id.</u> (quoting <u>Monell</u>, 436 U.S. at 691).  For instance, a city government "may be sued for constitutional deprivations visited pursuant to governmental 'custom' even though such a custom has not received formal approval through the body's official decisionmaking channels."  <u>Monell</u>, 436 U.S. at 690-91.  In such a case, the plaintiff must show that "the relevant practice is so widespread as to have the force of law."  <u>Brown</u>, 520 U.S. at 404.

Here, when the facts are taken in the light most favorable to Plaintiff, he has established municipal liability regarding his allegations that the repeated strip searches violated his rights

under the First and Fourth Amendments.[16]  The municipal liability is based on a practice or

custom by Defendant Wayne County.[17]  Plaintiff was strip searched *every* time that he re-entered

the jail and then again when he subsequently returned to his jail cell.  As Plaintiff often traveled

back and forth between the jail and federal court, his allegations involve more than just one

instance of an alleged constitutional violation.  The facts show that there was a pattern of

*repeated* and *regular* strip searches at Plaintiff's cell, even though Plaintiff had just been

stripped fully naked and thoroughly searched when he re-entered the jail.  Although the Wayne

County Jail Operations Manual did not expressly authorize a second strip search at Plaintiff's

cell, it seems that city officials and supervisory personnel were surely aware about the practice of

repeatedly strip searching Plaintiff—Plaintiff was in the Wayne County Jail for almost three

years, and Defendants themselves admitted that Plaintiff "required additional supervision by

supervisory officers during transport."  (Defs.' Br. Supp. Mot., 7.)  At the very least, there is a

question as to whether such officials and supervisors were aware of such conduct.

 As such, there is a genuine issue of material fact as to whether Defendant Wayne

County—either by its inaction or approval—was the moving force behind the repeated pattern of

unconstitutional strip searches.  As the Eastern District of Michigan has previously explained,

---

[16]The Court does not consider the question of municipal liability as to Count III, in which
Plaintiff alleges that Defendants violated his Eighth Amendment rights.  As explained above, the
Court has already found that there has been no violation of Plaintiff's Eighth Amendment rights.
As such, there cannot be a viable Section 1983 cause of action against Defendant Wayne County
based on those allegations.

[17]It should be noted that the Court does not find that Plaintiff has established municipal
liability based on a *written* policy.  As explained above, the Wayne County Jail Operations
Manual does not expressly authorize a *strip* search every time that Plaintiff returns to his housing
unit.  Thus, the repeated strip searches were conducted pursuant to practice or custom, not
written policy.

"[t]he existence of a governmental custom, its parameters, and whether a custom was practiced in an individual case are determinations left for the trier of fact—in this case, the jury." Barcume v. City of Flint, 819 F. Supp. 631, 655 (6th Cir. 1993).  Thus, Defendant Wayne County may be liable for the pattern of repeated strip searches that violated Plaintiff's First and Fourth Amendment rights.  Therefore, summary judgment will be denied as to Count IV.

## IV.    QUALIFIED IMMUNITY

Government officials, such as a sheriff's deputy, can be shielded from liability for their actions when those actions are done in the performance of their official duties.  Thomas v. Whalen, 51 F.3d 1285, 1289 (6th Cir. 1995).  In Saucier v. Katz, 533 U.S. 194 (2001), the United States Supreme Court laid out a two-prong test to determine whether a government actor is protected from liability by qualified immunity.  The Sixth Circuit has directly described this two-part test as follows:

> The first prong is a threshold question, namely: "Taken in the light most favorable to the party asserting the injury, do the facts alleged show the officer's conduct violated a constitutional right?"  If the answer is in the negative, then the inquiry ends.  If a violation could be established, the second prong requires an examination of whether "the right was clearly established" at the time of the events at issue.  In order for the right to be clearly established, "[t]he contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right."  The inquiry "must be undertaken in light of the specific context of the case, not as a broad general proposition." As the Court explained, "[t]he relevant dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable officer that this conduct was unlawful in the situation he confronted."

Weaver v. Shadoan, 340 F.3d 398, 406-07 (6th Cir. 2003) (quoting Saucier, 533 U.S. at 201-02) (citations omitted).

Here, Defendant Rojo is not entitled to qualified immunity as to Count I.[18]  As explained above, the factual allegations—when taken in the light most favorable to Plaintiff—show that Defendant Rojo violated Plaintiff's constitutional rights to be free from unreasonable searches.  In addition,  the Court finds that Plaintiff's constitutional rights were clearly established at the time of the events.  A reasonable deputy would have known that repeatedly conducting strip searches of Plaintiff—under these specific circumstances—was a violation of Plaintiff's rights.  Further, a reasonable deputy would be familiar with the Wayne County Jail Operations Manual.  As such, a reasonable deputy would have known that the manual does not authorize a repeated full-body *strip* search at Plaintiff's cell.  Rather, the manual authorizes only a *frisk* search in this specific situation.  Therefore, Defendant Rojo is not protected by qualified immunity.

## V.     <u>CONCLUSION</u>

Based upon the record established and documentary evidence presented, the Court will grant summary judgment as to Count III.  On the other hand, the Court finds that genuine issues of material fact exist as to Counts I and IV.  Therefore, the Court will deny summary judgment as to Counts I and IV.  Accordingly,

IT IS ORDERED that Defendants' Second Motion for Summary Judgment is granted as to Count III.

IT IS FURTHER ORDERED that Defendants' Second Motion for Summary Judgment is denied as to Counts I and IV.

---

[18]As the Court has not found a constitutional violation of the Eighth Amendment, the Court does not reach the issue of qualified immunity as to Count III.

IT IS FURTHER ORDERED that Plaintiff's Motion to Strike Defendants'

Second Motion for Summary Judgment is denied.[19]




_____s/Bernard A. Friedman_____
BERNARD A. FRIEDMAN
CHIEF UNITED STATES DISTRICT JUDGE

Dated:  July 27, 2007
        Detroit, Michigan



I hereby certify that a copy of the foregoing document
was served upon counsel of record by electronic and/or first-class mail.

s/Carol Mullins
Case Manager to Chief Judge Friedman

---

[19]Plaintiff asks the Court to interpret Defendants' Second Motion for Summary Judgment as an untimely motion for reconsideration regarding the Court's ruling on January 3, 2007.  The Court disagrees with Plaintiff and will not construe the motion at hand as a motion for reconsideration.  Defendants have filed a Second Motion for Summary Judgment.  The Federal Rules of Civil Procedure do not prohibit such a motion.  And, Defendants were timely in their filing.